# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 14, 2009 Session

## STATE OF TENNESSEE v. QUARTES WILLIAMS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-02146     Carolyn Wade Blackett, Judge**

---

**No. W2008-01946-CCA-R3-CD  - Filed September 14, 2009**

---

The defendant, Quartes Williams, was convicted by a Shelby County Criminal Court jury of first degree felony murder and facilitation of especially aggravated robbery and was sentenced as a Range I offender to concurrent sentences of life imprisonment and nine years, respectively.  On appeal, he argues that (1) the trial court erred in denying his motion to suppress his statement to police; (2) the trial court erred in admitting autopsy photographs; (3) the trial court erred in allowing Captain David Cupp to testify as a handwriting expert; and (4) the evidence is insufficient to support his convictions.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Robert Wilson Jones, District Public Defender; Barry W. Kuhn (on appeal) and Timothy Albers and Jane Sturdivant (at trial), Assistant Public Defenders, for the appellant, Quartes Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Goodman and Tracye Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This case arises out of the robbery and murder of the victim, Halvern Young, also known as "Tweety," who was found deceased in his Buick automobile on November 15, 2006.  As a result, the defendant and his cousin, Willie Williams,[1] were indicted on charges of first degree felony murder and especially aggravated robbery.

---

[1] Willie Williams will hereinafter be referred to as Williams.

**Suppression Hearing**

The defendant filed a pretrial motion to suppress his statement to police. At the suppression hearing, Sergeant Robert Collins with the Memphis Police Department testified that he was assigned to the homicide bureau in November 2006 and was involved in the investigation in this case. Sergeant Collins stated that he assisted Sergeant James Currin in interviewing the defendant on November 16, 2006. He recalled that the defendant was advised of his rights and that he was a suspect in the victim's murder. The defendant informed the officers that he understood his rights and agreed to waive them. Sergeant Collins stated that the defendant answered their questions and gave them a five-page statement, which the defendant was able to review. Sergeant Collins testified that the typed portion of the statement was started at 6:00 p.m. and was signed by the defendant at 6:46 p.m. He said that the typed statement contained the essence of what the defendant told the officers during the interview phase. Sergeant Collins testified that no one, in his presence, made any promises or threats to the defendant and noted that the first page of the defendant's statement informed him that he was under arrest.

On cross-examination, Sergeant Collins clarified that the defendant was not being questioned the entire time from 12:43 p.m., when he was advised of his rights, until 6:00 p.m., when the typing of the statement began, because "[the defendant] had gave [sic] us some information that Sergeant Currin sent some other investigators out to follow up on." Sergeant Collins acknowledged that the defendant initially denied having anything to do with the homicide. Sergeant Collins recalled that the defendant had not been arrested when he was brought in for questioning but noted that he had an ankle bracelet restraint on in the interview room. Sergeant Collins stated that the defendant was arrested after he made an oral admission during the interview.

Sergeant Connie Justice with the Memphis Police Department Homicide Bureau testified that she researched a phone number that was provided to her by other investigators taken from the victim's cell phone call record. The number "was one of the last numbers to have called the victim in a time frame which we thought maybe his death was involved or one of the last people to have spoken with . . . the victim." The number was 901-354-2363, and the call was made at 11:57 p.m. on November 14, 2006. Her research related the number to the defendant. Sergeant Justice recalled that on November 16, 2006, she and Sergeant Lundy went to the address associated with the phone number in an effort to locate the defendant.

Sergeant Justice testified that the house they went to was located on Floyd Avenue, and they spoke to the defendant's grandfather who informed them the defendant was out with someone named "Willie." The grandfather gave the officers a description of the vehicle the defendant and "Willie" were in, and Sergeant Justice left her contact information for the grandfather to give the defendant. The officers drove to several places to look for the vehicle. Approximately forty-five minutes later, at 11:00 a.m., they drove back by the house on Floyd Avenue and saw a vehicle matching the description parked in the front yard. The officers were invited inside, and Sergeant Justice saw the defendant coming from the back with the paper containing her contact information in his hand.

Sergeant Justice told the defendant they needed to speak to him, patted him down for safety, placed him in handcuffs, and had uniform patrol take him to the police station. She recalled that the defendant was calm and cooperative, but said "he was not free to go" because he was a person of interest in a homicide. Sergeant Justice testified that she did not fill out the arrest ticket on the defendant or the request for a forty-eight-hour hold. After being shown both documents, she said it appeared that Sergeant Currin had filled out both of them. She noted the arrest ticket was dated November 16, 2006, at 5:30 p.m., and the forty-eight-hour hold request showed the time of 2:20 p.m.

**Trial**

Christopher Rhodes, the victim's brother, testified that the last time he saw his brother was three days before his body was found.

Officer Christopher Parker with the Memphis Police Department testified that he was dispatched to 905 Frayser Circle in Shelby County on November 15, 2006, around 3:00 p.m. to investigate a suspicious vehicle. He was informed that it appeared someone was inside the vehicle and it had been at the location since the morning. When he arrived, Officer Parker observed a black Buick parked on the side of the street in front of a vacant home. He knocked on the passenger's side window because he could see the shadow of a figure in the car, but the figure did not respond. Officer Parker looked through the front window and noticed that the figure was a male, slumped over to the right with dried blood coming from his nose. When other officers and the paramedics arrived at the scene, they opened the driver's side door, checked the victim's vital signs, and waited for the homicide detectives.

Officer William Merritt with the Memphis Police Department testified that on November 15, 2006, he was dispatched to the scene to investigate "a male that had been shot to death [who] was sitting inside of a vehicle." The officers canvassed the neighborhood, but most of the homes were boarded up and vacant. A wrecker was called to transport the vehicle, the victim's body, and everything inside the car to the crime lab intact. Officer Merritt also prepared a subpoena for some cell phone records.

Officer A.J. Pounds with the Memphis Police Department testified that he was working as a crime scene investigator on November 15, 2006, and reported to the scene of the homicide call in this case. Officer Pounds photographed and diagramed the scene and photographed the interior of the car and inventoried its contents once it was towed to the crime lab. The victim was inside the car, slumped over the armrest. When the armrest was raised, a pistol was found directly under the armrest, but it was not visible prior to raising the armrest. The pistol was an HK-40 caliber with six live rounds in it. The victim's wallet was on his person, and he was wearing earrings and rings. The wallet contained the victim's driver's license and assorted papers, but no money.

Sergeant Connie Justice with the Memphis Police Department Homicide Bureau testified that she researched the last telephone number the victim called as indicated in his call record and determined that the number was associated with the defendant. Sergeant Justice and another officer

went to a home at 987 Floyd Avenue to locate the defendant and talked to the defendant's grandfather. They returned later that day when the defendant was present and took him to the criminal justice center to interview him. Sergeant Justice noted that before putting the defendant in the squad car, she patted him down for safety because he was wearing baggy pants. She recalled that the defendant was cooperative. Sergeant Justice acknowledged that the number she researched was the number for the 987 Floyd Avenue residence.

Officer Ricky Davison with the Memphis Police Department Crime Scene Investigation Unit testified that on November 16, 2006, he processed a vehicle recovered from 905 Frayser Circle. Officer Davison photographed damage to the exterior of the vehicle, blood on the interior of the vehicle, and items inside the vehicle. He recalled that those items included, among other things, shoes, cell phones, a radar detector, and stereo equipment. The exterior of the vehicle had damage to the right front bumper and right signal light, was missing the right front hubcap, had a dent on the left front fender, and scratches to both side view mirrors. Officer Davison determined the damage to be fairly new given the lack of rust or oxidation and the presence of dirt where the scratches were located. Officer Davison stated that he did not find any shell casings, marijuana, or cash in the car. He did not recover any usable fingerprints from the vehicle.

Sergeant James Currin with the Memphis Police Department testified that he was assigned to the homicide bureau in November 2006 and served as the case coordinator for the investigation in this case. Sergeant Currin retrieved a cell phone located on the victim's person and searched for the last numbers called and received. He gave the list of phone numbers to Sergeant Justice, whose investigation led to the defendant within forty-eight hours. When the defendant was brought to the police station, Sergeant Currin advised him of his Miranda rights, the defendant waived his rights, and Sergeant Currin and Sergeant Collins interviewed him. During the interview, the defendant implicated himself as having been involved in the events surrounding the victim's death but indicated that Willie Williams was the person who actually killed the victim. Sergeant Currin observed that the defendant was calm at the beginning of the interview but became obviously nervous as the interview continued. The defendant's statement was reduced to writing, and he reviewed and signed it.

Sergeant Currin testified that, in his statement, the defendant explained that he was with his cousin, Willie Williams, when Williams received a phone call from the victim. After the phone call, Williams asked the defendant if he "want[ed] to help him with a little business that he wanted to take care of." The defendant said that he told Williams he would go with him but would not do anything. Later, they received another call from the victim and went outside and got into the victim's car. Williams sat in the front passenger's seat, and the defendant sat in the back. The defendant explained that the victim met with them because Williams was going to buy marijuana from the victim. According to the defendant, they drove away and when they "got to the stop sign and that is when my cousin pulled the trigger. We drove the car to Frayser Circle and I got out and started running." The defendant said that Williams took the marijuana and $250 from the victim, of which he received $100 and "smoked some of the weed." The defendant bought an outfit and shoes with the money Williams gave him.

-4-

Sergeant Currin further testified that the defendant said that Williams shot the victim in the back of the head when the victim was looking to the left to see if a car was coming, but he did not recall in what hand Williams held the pistol. Williams had had the gun for no more than a week. The defendant said that he tried to talk Williams out of killing the victim, but Williams laughed and "said, cuz, you shaky."

Sergeant Currin testified that they began reading the advice of rights form to the defendant at 12:43 p.m. and he signed his statement at 6:46 p.m. He said that the actual questioning took place non-continuously for approximately four hours and that typing the statement took thirty minutes to an hour. The defendant was not under arrest before he was questioned.

Sergeant Currin testified that he received a handwritten letter, addressed to him, from Miss L. Jackson. Enclosed with the letter was another handwritten letter that appeared to be in a different handwriting. On the upper right-hand corner of the enclosed letter was the initial Q and the last name Williams, which Sergeant Currin understood to be from the defendant. The enclosed letter also contained references that could be attributed to the facts of the defendant's case. Sergeant Currin noted that the defendant's booking number was 06136181, and the booking number on the enclosed letter was 0613618 plus another numeral that was cut off from the photocopy.

Officer Bobby Montgomery with the Memphis Police Department testified that he was dispatched to a residence at 3201 Hardin Avenue in response to an abandoned child call. The complainant informed him that her cousin, Shanquanita Kelly, and William Williams had left the baby there the previous evening. Upon questioning the complainant, Officer Montgomery learned that there was a gun in the attic of the residence and called a crime scene officer to the scene.

Officer Sam Blue with the Memphis Police Department testified that he reported to a residence at 3201 Hardin Avenue on November 17, 2006, in the capacity of a crime scene investigator. He photographed and collected the gun, a Smith and Wesson thirty-eight caliber, six-shot revolver, into evidence. The gun was found under a board wrapped in a white shirt and contained three live rounds. The previous day, November 16, 2006, Officer Blue reported to a residence at 987 Floyd Avenue where he took pictures and tagged items of clothing.

Dr. Lisa Funte, a medical examiner in Shelby County, testified that she performed the autopsy on the victim and determined that he died of a gunshot wound to the head. She noted that the gunshot entered on the back left side of the victim's head and remained in the skull. Dr. Funte observed no evidence of gunshot residue in the victim's hair, or soot or stippling on the skin underneath the victim's hair. However, certain features on the abrasion ring were indicative of a contact wound. She determined that the wound was most likely a distant gunshot wound, but she could not rule out the possibility that it was a contact gunshot wound.

Agent Shelly Betts with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory Firearms Identification Unit testified that she examined a Smith and Wesson thirty-eight special caliber revolver in this case. She was also given one fired bullet recovered during the autopsy and

three unfired cartridges to examine. Betts determined that the bullet recovered during the autopsy had been fired from the Smith and Wesson revolver.

Shanquanita Kelly testified that she pled guilty to being an accessory after the fact in this case and received a sentence of split confinement. Kelly said that she and the defendant had been friends for a couple of years prior to the crime. She stated that at the time of the crime, she was dating and living with the defendant's cousin, Willie Williams, at the Frayser Manor Apartments. Kelly recalled that on the night before the defendant was arrested, she, the defendant, and Williams smoked marijuana and purchased a money order in the amount of $99 to apply toward their utility bill.

The next day, Kelly was at the apartment talking to Williams on the phone, while he and the defendant were at their uncle and grandfather's house on Floyd Avenue. At that time, the police arrived at the house on Floyd Avenue and took the defendant to the police station for questioning. Later, the police arrived at Kelly's apartment looking for Williams, but he was not there. When Williams returned, she told him the police were looking for him, and the two of them took her son to her cousin's house on Hardin Avenue. Kelly recalled that Williams took a bag with a gun in it and put it in her cousin's attic. Kelly said that she had seen Williams and the defendant with the gun before at her apartment and had seen the defendant with it in the car on his lap "[e]very time he rode in the car."

Kelly testified that the next day, she and Williams left her baby at her cousin's house and went to the home of Williams' mother. Later, they went to Kelly's mother's house and then to her brother's house where she and Williams were eventually arrested. Kelly stated that she sometimes went by the name "Shay" and that Williams' nickname was "Nah Nah." On cross-examination, Kelly acknowledged that she originally told the police she had not seen Williams with a gun at the house on Hardin Avenue or seen him go into the attic, but she explained that she did not tell the truth because she was scared of "[s]nitching on somebody."

Captain David Cupp with the Bartlett Police Department was accepted by the court as an expert in handwriting analysis. Captain Cupp compared the enclosure letter sent to Sergeant Currin with six to eight documents written by the defendant and was "one hundred percent sure" the enclosure letter was written by the defendant. Captain Cupp said that when doing a comparison, he looked for eleven indications with each letter in each word. In examining the known writings of the defendant, Captain Cupp made a list of fourteen things unique about the defendant's handwriting and then noted those traits in the questioned document.

The defendant elected not to testify or otherwise present any proof.

Following the conclusion of the proof, the jury returned with a verdict of guilty of first degree felony murder in count one and of the lesser-included offense of facilitation of especially aggravated robbery in count two.

## ANALYSIS

### I. Motion to Suppress

Prior to trial, the defendant filed a motion to suppress his statement to police. In denying his motion to suppress, the trial court found that the officers had reasonable suspicion that the defendant might have knowledge concerning the victim or the homicide given the defendant's telephone number was one of the last numbers called by the victim. The court further found that the State met its burden of showing that the defendant was advised of his rights, voluntarily waived his rights, and gave a statement to police. On appeal, the defendant argues that the trial court erred in admitting his statement because he was advised of his rights before, and not after, he became an actual suspect.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)).

We initially note that the defendant's actual motion to suppress is not contained in the record before us. However, from the transcript of the hearing on the motion, we glean that the defendant argued for suppression on the basis that he was seized without probable cause or reasonable suspicion based on specific and articulable facts and that his statement was coerced. Therefore, his argument on appeal is essentially based on a different theory than that argued at suppression. In any event, the record shows that the defendant was advised of his rights at 12:43 p.m. and waived his rights, agreeing to talk to the police. The record further shows that the first page of the defendant's statement, started at 6:00 p.m., apprised the defendant that he was under arrest and again advised him of his rights. Sergeant Collins testified at the suppression hearing and Sergeant Currin testified at the trial that the defendant was not threatened or promised anything in exchange for this statement.

The record shows that the defendant was clearly advised of his rights, waived those rights, and voluntarily gave a statement to police.

## II. Autopsy Photographs

The defendant argues that the trial court erred in admitting photographs from the victim's autopsy because the medical examiner's testimony established the cause of death.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

Here, the trial court found no problem with the autopsy photographs. The medical examiner testified that the victim died as the result of a gunshot wound to the head. The photographs supported the medical examiner's testimony that the bullet entered the left side of the victim's head and traveled to the right side of the skull where it ricocheted and imbedded. The x-ray photograph demonstrated how the medical examiner was able to localize the bullet in the victim's head. In sum, the photographs are illustrative of the medical examiner's testimony and useful to assist the jury in understanding this testimony. Moreover, the photographs are not gory, gruesome, or bloody. The trial court did not abuse its discretion in admitting the photographs.

## III. Handwriting Expert

The defendant argues that the trial court erred in allowing Captain David Cupp to testify as a handwriting expert. He asserts that Captain Cupp's testimony did not meet the criteria set out in McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997), to qualify as an expert because he was not familiar with the history of handwriting analysis, not familiar with any scientific studies, his work was not subject to peer review, he did not know the potential rate of error of handwriting analysis, there was no testimony that handwriting analysis was generally accepted in the scientific community, and his research was done for the purpose of litigation.

The trial court is given broad discretion in resolving questions concerning the admissibility of expert testimony, and we will not overturn its ruling absent a finding that it abused its discretion. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002); State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). "The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal

standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Coley, 32 S.W.3d at 833 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)). Moreover, expert testimony must be both relevant and reliable before it may be admitted. McDaniel, 955 S.W.2d at 265. Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 of the Tennessee Rules of Evidence requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

In McDaniel, our supreme court set out a non-exclusive list of factors useful in determining reliability when applying Rules 702 and 703. The supreme court said that a trial court *may* consider: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation. McDaniel, 955 S.W.2d at 265.

Later, in Stevens, our supreme court held that a trial court, in its discretion, *may* apply the McDaniel factors to measure the reliability of all expert testimony, whether scientific, technical, or specialized, offered under Rule 702. 78 S.W.3d at 834. The court elaborated that in the exercise of its discretion, the trial court must first determine whether "the witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of the expert's expertise. Tenn. R. Evid. 702. The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*." Id.

Captain Cupp testified that his background in handwriting analysis began in 1998 when he was chosen to attend the Secret Service's two-week academy. Thereafter, he worked as an apprentice for a year under a handwriting expert and had been analyzing handwritings for the past ten years. Captain Cupp stated that he received updates on new findings and opinions from the professional organizations he belonged to, the Association of Certified Fraud Specialists and the National Association of Fraud Examiners. Captain Cupp explained that he had to be re-certified every year through the organizations, which involved sending in his hours and number of cases worked. He said that he had been allowed to testify as an expert in the field of handwriting analysis in the courts of Tennessee on forty to fifty occasions and also in the federal courts.

The trial court accepted Captain Cupp as an expert, stating:

[E]ven though the expertise of [Captain] Cupp may not be to the same extent as to the medical examiner or someone else as far as medical degrees . . .[,] there's no question that [Captain] Cupp has specialized knowledge that most lay people would not have as to handwriting samples. That he has practiced it in numerous courts. That this is only being presented to the jury to assist them. They don't have to accept what he says. They are free to reject what he says. This is only something that will be allowed to assist them as to his opinion.

. . . .

And again, I'm really basing this on not so much as whether or not the handwriting is an exact match or is not an exact match, but I think that because it is a question, that there are documents available to compare it to, that there are numerous documents that the defendant has written in his own handwriting, and there's a question as to whether or not this letter which seems to indicate the defendant having serious questions as to his co-defendant and the implication that it ought to be brought before the jury.

Again, I would emphasize that the expert testimony of [Captain] Cupp would be really only to assist the jury in specialized knowledge.

I'm not saying that what he's saying is actually true or not true, but I think that he has developed such an expertise that would allow him to at least be able to give an opinion before the jury.

The record reveals no abuse of discretion in the trial court's qualifying Captain Cupp as an expert in the field of handwriting analysis. Captain Cupp's testimony indicates that he has specialized knowledge, skill, experience, and training that could substantially assist the jury in determining whether the defendant was the author of the questioned letter. As noted above, the trial court *may* in the exercise of its discretion, but is not required to, analyze the McDaniel factors in making a reliability determination under Tennessee Rule of Evidence 702. Moreover, the credibility, and thus acceptance or rejection, of Captain Cupp's expert testimony was ultimately for the jury to decide, and the trial court charged the jury accordingly. Of note, this court has previously upheld a trial court's decision to allow Captain Cupp to testify as a handwriting expert over a McDaniel challenge. See State v. Leon Flannel, No. W2007-00678-CCA-R3-CD, 2008 WL 4613829, at *13 (Tenn. Crim. App. Oct. 13, 2008), perm. to appeal denied (Tenn. Mar. 23, 2009). In addition, the questioned letter indicates on its face that it was written by the defendant because the booking number in the letter is the same as the defendant's with the exception of one numeral cut off at the end, and he references himself in the letter. The defendant is not entitled to relief.

## IV.  Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence.  When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]"  Tenn. Code Ann. § 39-13-202(a)(2).  Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Id. 39-13-401(a).  Especially aggravated robbery is robbery that is accomplished with a deadly weapon and where the victim suffers serious bodily injury.  Id. § 39-13-403(a).

A person is criminally responsible for an offense committed by the conduct of another, if:

(1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Id. § 39-11-402.

A person facilitates a felony if, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a).

In the light most favorable to the State, the evidence shows that the defendant accompanied Williams to meet the victim so Williams could purchase marijuana from the victim. The defendant and Williams got into the victim's car, and while at a stop sign, Williams shot the victim in the head. Williams took $250 and marijuana from the victim, giving the defendant $100 and smoking the marijuana with him. The defendant purchased clothing and shoes with his portion of the money. The officers' investigation revealed that the last number called from the victim's phone was a number associated with the defendant. Moreover, Shanquanita Kelly had seen both Williams and the defendant with the gun before, but she noted that the defendant had it in the car on his lap "[e]very time he rode in the car." From this evidence, a rational trier of fact could conclude that the defendant, "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense," aided or attempted to aid Williams in killing the victim during the course of a robbery. From this evidence, the jury could have additionally concluded that the defendant furnished substantial assistance in robbing the victim, knowing what Williams intended to do.

In addition, a rational trier of fact could have arguably found the defendant guilty under a direct responsibility theory. In his statement, the defendant said that he was sitting in the backseat of the victim's car and Williams was sitting in the front passenger seat, and Williams shot the victim while he was turned toward the left. However, the handwritten letter to "Nard Nard," with indications it was authored by the defendant, said that he lied to the police. The medical examiner testified that the bullet entered the left and slightly rear side of the victim's skull and traveled horizontally to the right. As such, evidence that the defendant was sitting in the backseat would tend to support a conclusion that the defendant actually fired the gun.

The defendant argues that the verdicts were inconsistent in that he was found "guilty of being the perpetrator of the murder, but only assisting in the robbery." We disagree that the verdicts are plainly inconsistent because, in his statement, the defendant alleged that he was not in the car when Williams took the victim's marijuana and money which, if believed by the jury, could have been the

-12-

basis for the lesser facilitation conviction.  In any event, consistency of verdict is not required, so long as "the evidence establishes guilt of the offense upon which the conviction was returned." Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973); State v. Hayes, 7 S.W.3d 52, 57 (Tenn. Crim. App. 1999); State v. Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433, at *3-4 (Tenn. Crim. App.  Dec. 3, 1997), perm. to appeal denied (Tenn. Sept. 21, 1998).  In addition, the defendant avers that the jury could not "speculate that part of [his] statement [w]as true and part false."  However, the jury was free to believe or reject all or part of the defendant's statement.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE